**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

CHRISTINA M. MARUDAS,[1]

          *Plaintiff*,

*v.*

COMMISSIONER OF SOCIAL SECURITY,

          *Defendant.*

_____/

CASE NO. 2:17-cv-12703

DISTRICT JUDGE NANCY G. EDMUNDS

MAGISTRATE JUDGE PATRICIA T. MORRIS

## REPORT AND RECOMMENDATION ON CROSS MOTIONS FOR SUMMARY JUDGMENT (Docs. 15, 16)

## I.    RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Plaintiff is not disabled. Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment, (Doc. 15), be **DENIED**, that the Commissioner's Motion, (Doc. 16), be **GRANTED**, and that this case be **AFFIRMED.**

## II.    REPORT

### A.  Introduction and Procedural History

This is an action for judicial review of a final decision by the Commissioner of Social Security denying Plaintiff Christina Marudas's claims for Social Security Supplemental Insurance benefits ("SSI") under Title XVI, 42 U.S.C. §§ 1381-1383f, and

---

[1] Although Plaintiff's name appears on the docket as "Christine Marudas," I note that Plaintiff's court filings indicate her name is "Christina Marudas," *e.g.*, (Doc.15), and thus spell it accordingly.

for Child's Insurance Benefits. (Doc. 15). Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to the undersigned Magistrate Judge. (Doc. 4). The matter is currently before the court on cross-motions for summary judgment. (Docs. 15, 16). Plaintiff has also filed a response to Defendant's motion. (Doc. 18).

Plaintiff filed for SSI on August 29, 2014, (Tr. 138–46), and for child's insurance benefits on November 13, 2014, (Tr. 147–53). Plaintiff was born on September 9, 1986. (Tr. 138). As required by § 202(d) of the Social Security Act for entitlement to child's insurance benefits, Plaintiff and was under age 22 on the date her disability allegedly began: September 9, 1992. (Tr. 138). An initial denial for her SSI claim issued on September 12, 2014. (Tr. 77). At Plaintiff's request, an administrative hearing on both claims was held on January 13, 2016, before Administrative Law Judge ("ALJ") John Dodson. (Tr. 8–25). Several months later, the ALJ issued a decision denying Plaintiff's claims. (Tr. 26–65). In June 2017, the Appeals Council denied Plaintiff's request for review. (Tr. 1–5). This action followed.

### B.  Standard of Review

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x 502, 506 (6th Cir. 2014) (internal citations omitted). Substantial evidence is "more than a scintilla of evidence but less than a

preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted).

The court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989). The court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id*. (internal citations omitted).

### C. Framework for Disability Determinations

Under the Act, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).   The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

(i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled. . . .

(ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled. . . .

(iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled. . . .

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled. . . .

(v) At the fifth and last step, we consider our assessment of your residual functional capacity ["RFC"] and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). A claimant must establish a medically determinable physical or mental impairment (expected to last at least twelve months or result in death) that rendered her unable to engage in substantial gainful activity. 42

U.S.C. § 423(d)(1)(A). The burden transfers to the Commissioner if the analysis reaches the fifth step. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

### D. ALJ Findings

Following the five-step sequential analysis, the ALJ concluded that Plaintiff had not been disabled under the Social Security Act before September 9,[2] 2008, the date she attained age 22, or through the date of the decision, April 25, 2016. (Tr. 11). At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of September 9, 1992. (*Id.*). At step two, he determined that Plaintiff had the following severe impairments: anxiety disorder and learning disorder. (*Id.*). Moving on to step three, he decided Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment. (Tr. 13–15). The ALJ next concluded that Plaintiff had the residual functional capacity to perform a full range of work at all exertional levels but with the following non-exertional limitations: "can perform unskilled work, with one[-] to two[-]step repetitive tasks, can

---

[2] Initially, the ALJ's opinion correctly states that Plaintiff's birthday is September 9, 1986, (Tr. 11), and she attained age 22 on September 9, 2008, (Tr. 13). Later, however, the ALJ incorrectly states that she attained age 22 on September 8, 2008. (Tr. 21). Considering that the ALJ first stated both dates correctly, this appears to be simply a typographical error. As Plaintiff neither makes note of the error nor argues it is harmful, I suggest she has waived any such argument. *See Kuhn v. Washtenaw Cty.*, 709 F.3d 612, 624 (6th Cir. 2013).

have no production[-]like standards, cannot work with the public, and can have occasional interaction with co-workers and supervisors." (Tr. 15).

Plaintiff had no past relevant work, (Tr. 19), so the ALJ proceeded to step five, where he found that considering Plaintiff's age, education, work experience, and RFC, jobs that Plaintiff could perform existed in significant numbers in the national economy. (Tr. 20).

### E.  Administrative Record

#### 1.       Medical Evidence

The court has thoroughly reviewed Plaintiff's medical record. In lieu of summarizing her medical history here, the court will make reference and provide citations to the record as necessary in its discussion of the parties' arguments.

#### 2.       Administrative Hearing

##### a.  Plaintiff's Testimony

An administrative hearing was held in Plaintiff's case on January 13, 2016, before ALJ John Dodson, (Tr. 26–65), at which Plaintiff testified. (Tr. 32–45).

While in school, Plaintiff said, she was "under special education" due to "learning disabilities and basically behavioral problems." (Tr. 33). She was bullied for being in special education and because she was "different," and she had trouble making friends "because they all thought [she] was different because [she] was in special ed." (Tr. 34). After leaving school in twelfth grade, she earned her GED. (Tr. 33).

Since high school, she had worked only "short jobs" lasting a week to a month, due to her anxiety. (Tr. 34–35). She reported that she "usually had a panic attack within the first ten minutes" of her first day of work. (Tr. 35). She explained: "Usually when I'm

around somebody that I've known for a long time or that I'm comfortable with, my anxiety is not there. But it's when I'm in a new situation . . . usually my anxiety is through the roof . . . ." (Tr. 35–36). For example, she said, her anxiety was high when she went to the grocery store by herself; she would rush to finish her shopping and often forget things because she did not want to have a panic attack in public. (Tr. 36). Her brain would "go[] in about six different directions," making it difficult for her to concentrate. (*Id.*).

Plaintiff testified that she had three children: a seven-month-old daughter living with her father and Plaintiff; a son living with his aunt, who had guardianship; and a son whom her cousin adopted "after a CPS case that went horribly wrong." (Tr. 37–38). Each child had a different father. (Tr. 37). Her daughter's father, Mike, was "very supportive." (Tr. 38). She described how if she was taking care of their child at home and felt overwhelmed or anxious, she called him for help. (*Id.*). This happened "at least once or twice a week." (*Id.*). She also got help from her mother. (*Id.*).

Plaintiff was living in her own apartment with her significant other at the time of the hearing, which was "a big step of independence . . . a big step in the right direction," that she "fe[lt] comfortable with." (*Id.*).  Over the past several years, Plaintiff had at times lived with her mother. (Tr. 38–39). Her mother had helped her get set up with her own apartment and was "generally a phone call or a drive away." (Tr. 39).

Plaintiff had never had a driver's license because she was afraid to drive. (Tr. 53–54). Instead, Plaintiff's mother gave her rides or she took the bus. (Tr. 39–40). She arranged her own doctors' appointments. (Tr. 49).

7

Her anxiety, however, stood in the way of full-time employment. (Tr. 40). She had been attending therapy weekly for several months but complained that "it just hasn't seemed to work as far as [her] anxiety and the way [she] feel[s] around people." (Tr. 40). Her therapist had also prescribed Celexa and Atvian, which helped "somewhat." (Tr. 41). Plaintiff had used illegal drugs in the past, but at the time of the hearing she had not for almost three years. (Tr. 42). She had also quit smoking. (Tr. 42).

For the past two years, (Tr. 44), Plaintiff had been volunteering once or twice a week for several hours at a time, (Tr. 59), for a nonprofit that worked with faith organizations to help provide shelter for the homeless in Ann Arbor at various churches. (Tr. 42). She sat at the front desk signing people in and talking to them; she explained, "I know most of the people that go to it, so I'm generally comfortable around them." (*Id.*). At times she had been scheduled to volunteer but skipped because she "either had a bad day or . . . [had] gone not knowing anybody in the room, had an anxiety attack[,] and left." (*Id.*).

Her partner, Mike, usually cleaned the house and did the cooking, and he did most of the grocery shopping. (Tr. 57–58). Plaintiff generally went to the local market and bought "just barely essentials." (Tr. 58). Plaintiff did laundry every two weeks, and Mike usually folded the clean clothes. (Tr. 57). Mike worked as a supervisor of maintenance and rental properties around town, so he was often on call. (Tr. 58).

### b.  The Testimony of Plaintiff's Mother

Plaintiff's mother, Mary Casanos Marudas, also testified at the hearing. (Tr. 44). Her mother had previously worked as a medical social worker, a psychiatric social

worker, and a play therapist; at the time of the hearing she was retired and worked with the cancer support community and as a life coach. (Tr. 45–46).

Her mother described how ever since Plaintiff was a baby, she had had difficulty making eye contact. (Tr. 46). As a child, she had been was very energetic and talkative, "really kind of out there." (*Id.*). At five years old, she saw a psychiatrist because she was having a difficult time in school, and "they said she had severe ADHD and anxiety." (*Id.*).

Her mother went on to describe how Plaintiff was "scattered" and had difficulty reading nonverbal cues, with her coordination, and with expressing herself. (Tr. 49). She needed reminders at each step of a task. (Tr. 51). Plaintiff had panic attacks at least three times a week, during which she "can't say anything, and then . . . the cortisone kind of kicks in and she starts scratching herself raw almost . . . . because the cortisone cause[s] itching." (Tr. 49).

Plaintiff's mother testified that Plaintiff took care of her daughter with the help of her partner, Mike. (Tr. 52-53). Her mother also helped her about three days a week. (Tr. 53).

### c.  The Vocational Expert's Testimony

 VE Larissa Boase also testified at the administrative hearing. (Tr. 54–63).  To begin, the ALJ asked the VE to assume a person with the same age, education, and work experience as Plaintiff, "capable of work at all exertional levels, but this would be unskilled work involving one[-] to two-step repetitive tasks. There could be no production-like standards and this would be work not involving the public, with only

occasional interaction with coworkers and supervisors." (Tr. 54). The VE testified that such a person could work as a box bender (60,000 jobs nationally) or a furniture cleaner (70,000 jobs nationally). Plaintiff's mother, however, raised a concern that Plaintiff had had pneumonia several times and exposure to fumes as a furniture cleaner would be "extremely dangerous." (Tr. 56). Plaintiff also interjected that she had "trouble cleaning her house" because she "never grasped that whole concept." (Tr. 56–57).

In place of furniture cleaner, the VE offered the position of garment bagger (200,000 jobs nationally). Next, Plaintiff's attorney asked whether someone could sustain work if she "were only able to pay attention to work tasks for 85% of the time on a consistent basis, like even on a two hour by two hour period." (Tr. 61–62), to which the VE replied that she could not. (Tr. 62). A worker in an unskilled position could be off-task a maximum of ten percent of the time. (Tr. 63). Further, the VE testified that jobs usually had a 90-day probation period during which no absences were permitted, and generally no more than two unexcused absences would be permitted in a month in an unskilled job. (Tr. 62).

Finally, the VE clarified that the Dictionary of Occupational Titles did not discuss breaks, absences, or time off-task, and her testimony regarding those topics was based on her knowledge of the labor market and how those jobs were performed. (Tr. 63).

### F.  Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations carve the evidence into categories: "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513. "Acceptable

medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006). Both acceptable and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id*. When acceptable medical sources issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure her RFC. *Id.* § 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. 20 C.F.R. § 404.1527(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *see also* 20 C.F.R. § 404.1527(c). The ALJ must also apply those factors

to "other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540–42 (6th Cir. 2007); SSR 06-03p, 2006 WL 2329939, at \*2 (Aug. 9, 2006).

Certain opinions of a treating physician receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2); *see also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at \*1–2 (July 2, 1996). Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at \*1–2 (July 2, 1996). The ALJ "will not give any special significance to the source of an opinion" regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the person's RFC, or the application of vocational factors. 20 C.F.R. § 404.1527(d)(3).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to a treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2); *see also Dakroub v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits

> must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996); *see also Rogers*, 486 F.3d at 242. For example, an ALJ may properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec'y of Health & Human Servs.*, 882 F. Supp. 637, 640–41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273 (Table), 1995 WL 138930, at *1 (6th Cir. 1995).

The claimant must provide evidence establishing her RFC. The statute lays the groundwork for this, stating, "An individual shall not be considered to be under a disability unless he [or she] furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A); *see also Bowen*, 482 U.S. at 146 n.5. The RFC "is the most he [or she] can still do despite his limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2).

### G. Analysis

Plaintiff avers that the Commissioner's decision was not supported by substantial evidence because of its reliance on two pieces of evidence: (1) the findings of a non-examining psychological consultant, and (2) the findings of a psychologist, which the ALJ purportedly misread. (Doc.15 at ID 649).

### 1. The ALJ did not err in relying on the findings of consulting psychologist Dr. Leonard Balunas.

First, Plaintiff argues that Dr. Leonard Balunas's opinion cannot amount to substantial evidence because Dr. Balunas never examined Plaintiff and he made findings "completely and undeniably contrary to the evidence of record." (Doc. 15 at ID 655). The

ALJ gave great weight to Dr. Balunas because his opinion was "consistent with the evidence of record." (Tr. 19).

At the outset, I note that reliance on a non-examining state agency consultant is usually not error in and of itself. "[A]n ALJ is permitted to rely on [a] state agency physician's opinions to the same extent as she may rely on opinions from other sources." *Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 274 (6th Cir. 2015); *accord*, *e.g.*, *Wilson v. Colvin*, no. CV 15-13409, 2017 WL 370785, at *4 (E.D. Mich. Jan. 23, 2017), *report and recommendation adopted sub nom. Wilson v. Comm'r of Soc. Sec.*, No. 2:15-CV-13409, 2017 WL 710650 (E.D. Mich. Feb. 23, 2017) ("[T]he Sixth Circuit has squarely rejected Wilson's argument that an ALJ may not rely on a state agency consultant in determining a claimant's RFC."). Plaintiff does not argue the point beyond apparently suggesting that an ALJ errs simply by relying on a source who never examined Plaintiff, and so I suggest this argument should fail.

Next, I turn to Plaintiff's blanket assertion that Balunas's findings were "completely and undeniably contrary to the evidence of record," (Doc. 15 at ID 655), apparently referring generally to the enormous swaths of the record she recounted earlier in her brief. Unfortunately, Plaintiff does not pinpoint even one specific example of such a contradiction. Nor does she explain how Dr. Balunas's recommended restrictions were inadequate to account for her limitations.

Dr. Balunas reported that Plaintiff had two severe impairments: "anxiety disorders" and "learning disorder." (Tr. 70). He found Plaintiff moderately limited in her ability to interact appropriately with the general public, to accept instructions and respond

14

appropriately to criticism from supervisors, and to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (Tr. 74). He explained that Plaintiff could "have occasional brief and superficial interactions with supervisors and coworkers but should not have contact with the public." (Tr. 74). He found her not significantly limited in her ability to ask simple questions or request assistance, or to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. (Tr. 74).

Dr. Balunas found Plaintiff moderately limited in her ability to respond appropriately to changes in the work setting, but not significantly limited in her ability to be aware of normal hazards and take appropriate precautions, to travel in unfamiliar places or use public transportation, or to set realistic goals or make plans independently of others. (Tr. 74). He explained that Plaintiff could "perform tasks requiring occasional minor changes in the work setting." (Tr. 74). Further, Dr. Balunas found Plaintiff moderately limited in carrying out detailed instructions or maintaining attention and concentration for extended periods, and restricted her to carrying out one and two step tasks that do not require extended periods of sustained concentration. (Tr. 73).

In line with Dr. Balunas's findings, the record shows that Plaintiff sometimes struggled with attention and concentration. *E.g.*, (Tr. 206, 313, 319, 466 (attention and concentration intact)); (Tr. 218 (concentration poor)); (Tr. 329 (able to focus adequately on examiner's questions)); (Tr. 351 (attention and concentration "fair")); (Tr. 577 (testing in 2001 finding "[m]easures of attention indicated moderate to severe problems")); (Tr. 583 (testing in 2016 finding attention and concentration mildly impaired)). In 2001, at

15

age fourteen, in 2001, testing revealed a full scale IQ score of 77 for Plaintiff. (Tr. 576). She tested at a full scale IQ score of 71 in 2014, (Tr. 376), and 80 in 2016, (Tr. 584).

As for Plaintiff's social skills, the record shows examiners frequently found Plaintiff "pleasant," (Tr. 322, 374), and "cooperative," (Tr. 206, 213, 313, 332, 337, 374, 396). Though at times she struggled with eye contact, (Tr. 213, 219, 224, 220, 310, 313, 316, 374), at other times she did not, (Tr. 213, 310, 322, 325, 337, 341, 345, 348, 396). Examiners noted her speech and language were normal in tone, rate, and volume. (Tr. 206, 213, 220, 310, 313, 316); *see also* (Tr. 325, 337, 341, 345, 348, 351, 365, 445 (normal rate, rhythm, volume, prosody)); (Tr. 387, 396) (normal rate, rhythm, volume, amount); (Tr. 449 (regular rate, volume, prosody)). She was repeatedly found oriented times three. (Tr. 206, 213, 310, 313, 322, 351, 375, 396, 408, 446, 449). Her thoughts were almost always linear, logical, and goal-oriented, *e.g.*, (Tr. 206, 315, 325, 337, 341, 345, 348, 355, 445, 449), *see also* (Tr. 224 ("generally" linear)); (Tr. 220, 316, 322 (logical and goal-oriented)); (Tr. 383, 388, 396, 445 (logical)); (Tr. 213, 310 (logical and expressed self adequately)). She arrived for many appointments in appropriate dress and with appropriate hygiene. (Tr. 212–13, 224, 316, 355, 395). *Cf.* (Tr. 219 ("disheveled" shortly after relinquishing custody of child)); (Tr. 325, 337, 341, 345 (unkempt, unwashed hair)); (Tr. 374 (dirt under nails and needed to brush teeth)); (Tr. 351 (casually groomed and dressed appropriately but with evidence of poor hygiene)).

She often reported difficulty interacting with people, *e.g.*, (Tr. 40, 269, 274, 281, 330, 374, 381, 384, 564, 582), but expressed that she was comfortable with her volunteer

work, (Tr. 363). She was in a long-term relationship, (Tr. 581–82), close with her mother, (Tr. 582), and had a small circle of longtime friends, (Tr. 582).

In 2014, she stated she had recently taken thirteen credits at Washtenaw Community College and received average grades; she had not asked for assistance at the special needs center. (Tr. 373). She was able to do basic housekeeping including vacuuming, washing dishes, and laundry, handled her own finances, and was learning to cook. (Tr. 373); *see also* (Tr. 581–82). She could and did use public transportation. (Tr. 39–40, 393). At the time of the hearing, she was living in an apartment with her significant other and caring for their then-seven-month-old daughter with his help. (Tr. 37–39). She was also able to arrange doctor's appointments for herself. (Tr. 40).

In short, I suggest the record reflects that Dr. Balunas recognized that Plaintiff suffered from severe impairments and accounted for them in his analysis— a far cry from Plaintiff's blanket assertion that Dr. Balunas's findings were "completely and undeniably contrary to the evidence of record." (Doc. 15 at ID 655). Thus, I suggest that Plaintiff has failed to show the ALJ erred by relying on the findings of consulting psychologist Dr. Balunas.

### 2. The ALJ did not err in assigning great weight to the findings of examining psychologist Dr. Thomas Rosenbaum.

Next, I turn to Plaintiff's complaints regarding the ALJ's treatment of Dr. Thomas Rosenbaum's findings. The ALJ gave great weight to examining psychologist Dr. Rosenbaum, characterizing Rosenbaum's findings as "consistent with the finding that the claimant is able to perform simple, routine work." (Tr. 18).

Plaintiff frames her argument as an allegation that the ALJ made a factual error in his reading of Dr. Rosenbaum's findings: "Quite obviously, [the ALJ's] conclusion is not supported by the findings described in Dr. Rosenbaum's report . . . ." (Doc. 15 at ID 654). But read in full, her argument appears to amount to a complaint that the ALJ cherry-picked unfavorable evidence.

For example, Plaintiff specifically calls the court's attention to Dr. Rosenbaum's IQ testing placing her in the borderline range of intelligence, (Tr. 376), Plaintiff's confusion during parts of his testing, (*id.*), that she had some difficulty with a math computation test, (Tr. 377), and Dr. Rosenbaum's report that people who respond to MMPI testing like Plaintiff "often have significant adjustment difficulties, including depression, anxiety, and a possible thought disorder," (Tr. 377). (Doc. 15 at ID 653). Further, Plaintiff pointed out that Dr. Rosenbaum diagnosed her with social anxiety disorder, specific learning disorder, and personality disorder, (*id.* (citing (Tr. 377)))— although it is worth noting that a diagnosis does not establish the severity of a condition or whether it has any effect on a claimant's functional capacity. *E.g.*, *Higgs v. Bowen*, 880 F.3d 860, 863 (6th Cir. 1988) (finding that "the mere diagnosis of arthritis . . . says nothing about the severity of the condition").

Contrary to Plaintiff's implications, the ALJ's opinion accurately noted Dr. Rosenbaum's diagnoses and Plaintiff's IQ score. (Tr. 18). In addition, he noted that Plaintiff told Dr. Rosenbaum she volunteered at a mission where she helped homeless people, and she felt comfortable doing so. (Tr. 18). He also repeated, quite correctly, that she reported enjoying hiking, canoeing, and fishing, performed household chores

including vacuuming, dishes, and laundry, and was learning to cook. (Tr. 18). Plaintiff did remark to Dr. Balunas that she was not depressed at the time, although she had some down days. (Tr. 18). And as the ALJ reported, she was well oriented times three, recalled two out of three objects after fifteen minutes, knew her birthdate, and was able to do calculations of six times seven and nine plus seven. (Tr. 18).

Further, I note that Dr. Rosenbaum found Plaintiff's scores reflected "reasonably strong reading skills commensurate with her abilities in areas of verbal comprehension," that Plaintiff scored in the average range on a spelling test, and that on a math computation task she achieved a standard score in the mild range of deficiency. (Tr. 377). Dr. Rosenbaum also suspected from administering the "MMPI-MiniMult" that Plaintiff "may be exaggerating her symptoms" and admitted it was "therefore difficult to interpret the profile pattern." (Tr. 377). At the conclusion of his report, Dr. Rosenbam found that Plaintiff would be able to manage her own benefit funds. (Tr. 378). I suggest these findings are far from "[q]uite obviously" inconsistent with the conclusion that Plaintiff could perform simple, routine work, and to the extent Plaintiff wishes the court to more heavily weight favorable evidence, I must decline. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 284 (6th Cir. 2009) ("[W]e see little indication that the ALJ improperly cherry picked evidence; the same process can be described more neutrally as weighing the evidence.").

While on the topic of Dr. Kroll, I note that Plaintiff also complains that the ALJ "simply reject[ed] out of hand" Dr. Kroll's opinion that, "due to her mental health and learning disabilities, the claimant was unable to obtain and maintain employment

sufficient to sustain herself financially." (Doc. 15 at ID 651) (citing Tr. 17). But the Sixth Circuit has found an ALJ may reasonably give no weight to a medical opinion because the physician's opinion is on a matter reserved to the Commissioner and the conclusion directly conflicted with the record. *Cosma v. Comm'r of Soc. Sec.*, 652 F. App'x 310, 311 (6th Cir. 2016). That is essentially what the ALJ found here: "[T]he record . . . clearly does not support the extreme limitations and is completely contradictory to the report of Dr. Rosenbaum . . . . Further, the decision as to whether the claimant is disabled is reserved for the Commissioner." (Tr. 17–18). Thus, I suggest the ALJ's analysis of Dr. Kroll's opinion on Plaintiff's disability was sufficient.

Finally, I recognize that Plaintiff also scorns the ALJ's characterization of Dr. Kroll's findings as "completely contradictory to the report of Dr. Rosenbaum," (Tr. 17)— in other words, a generous reader might understand Plaintiff to be implicitly disputing whether Dr. Rosenbaum's findings were a "good reason" to give "only some weight" to Dr. Kroll. (Tr. 17). Yet Plaintiff insists in her reply that "[t]his is not an issue as to the respective weighing of the various medical opinions." (Doc. 18 at ID 694). I see no reason to entertain the issue against Plaintiff's wishes.

### 3.     Substantial Evidence Supports the ALJ's RFC Determination.

Next, I turn to Plaintiff's contention that the record "demonstrates a continuous stream of medical evidence establishing that [P]laintiff had social, cognitive, psychiatric/psychologic, and personality issues" that amounted to a disability. (Doc. 15 at ID 649). Plaintiff dedicates a significant portion of her brief to recounting this evidence.

(Doc. 15 at ID 649–52). But so long as the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip*, 25 F.3d at 286 (internal citations omitted). Here, the ALJ analyzed Plaintiff's records—which span more than two decades—at great length to determine her RFC. (Tr. 15-19). He ultimately found her capable of work at all exertional levels but subject to the following non-exertional limitations: "can perform unskilled work, with one to two step repetitive tasks, can have no production like standards, cannot work with the public, and can have occasional interaction with co-workers and supervisors." (Tr. 15). A review of the ALJ's opinion reveals a variety of evidence supporting this RFC, including but not limited to the following:

The ALJ noted that Plaintiff had "mild restriction" in her activities of daily living, but was able to take the bus and go grocery shopping, and lived with her significant other and seven-month-old baby. (Tr. 14). He did acknowledge that the record showed claimant struggled with social interactions, did her grocery shopping quickly, and "was only able to work at a homeless facility because she knew the people she signed in well." (Tr. 14). Thus, he found she had moderate difficulties in social functioning. (*Id.*). He recounted Plaintiff's statements that she sometimes left her volunteer work due to anxiety, and had trouble recalling information from chapter to chapter when she read, and so he found she had moderate difficulties in concentration, persistence, or pace. (*Id.*).

Further, the ALJ considered that Plaintiff had minimal mental health treatment and had found that medication helped alleviate her symptoms "somewhat." (Tr. 14–15).

21

Plaintiff could make medical appointments for herself, although her mother sometimes drove her. (Tr. 15–16). She "liked to keep busy," biked, walked, and hiked. (Tr. 18). She earned her GED in 2005. (Tr. 19). In June 2013, she was attending community college and enjoying her classes. (Tr. 18). And the ALJ found it "of particular significance" that in February 2016 Plaintiff told the examining psychologist she was interested in mycology, the study of mushrooms, and hoped to obtain a certificate in the field. (*Id.*).

Additionally, he noted she was learning to cook and "apparently doing well at caring for her daughter." (*Id.*). She was also engaging in activities such as hiking, canoeing, and fishing, in addition to her volunteer work. (Tr. 19). She lived with her significant other and cared for her young daughter while her significant other was at work. (*Id.*). In short, I suggest that the ALJ's RFC determination is supported by substantial evidence, and that it is therefore irrelevant whether substantial evidence also supports a different conclusion.

Plaintiff's contention that the ALJ erred in his consideration of Plaintiff's volunteer work and activities of daily living is similarly unpersuasive. (Doc. 15 at ID 655). Plaintiff wishes the court to note, for example, that she volunteered "only two hours once or twice a week, and only if Plaintiff did not call off or leave early." (*Id.*) (internal citations omitted). But that goes only to the weight of the evidence, and the weighing of evidence is the Commissioner's province alone. *Mullins v. Sec'y of Health & Human Servs.*, 680 F.2d 472, 472 (6th Cir. 1982) ("Our task is not to reweigh the evidence. That is solely the province of the Secretary.") (citing *Wokojance v. Weinberger*, 513 F.2d 210 (6th Cir. 1975)).

### 4.      Plaintiff Waived Arguments She Failed To Develop in Her Opening Brief.

At the outset of Plaintiff's argument section in her opening brief, she summarizes her major arguments as follows:

> The ALJ's RFC assessment is not supported by substantial evidence, based as it is upon the findings of a nonexamining psychological consultant [Balunas] and purportedly upon the findings of a psychologist [Rosenbaum] who did not set forth specific limitations but who actually reported findings consistent with the remainder of the doctors who examined Plaintiff.

(Doc. 15 at ID 649). Those issues I have addressed above. In addition to those two arguments, Plaintiff's brief is also peppered with several additional arguments that she never fully develops.

In her reply to Defendant's response, Plaintiff asserts that she "contended in her motion that Dr. Kroll was not an examining physician, as the ALJ indicated, but instead a treating physician." (Doc. 18 at ID 691) (internal citation omitted). The extent of that contention, however, was the statement that "Dr. Kroll began treatment of plaintiff in April 2014," and the attached footnote: "The ALJ incorrectly characterized Dr. Kroll as an 'examining psychiatrist.'" (Doc. 15 at ID 651, 651 n.1). Although Defendant gamely engages with this footnote, (Doc. 16 ay ID 671-72), I suggest that Plaintiff's footnote alone does not amount to an argument, and the court should deem the issue waived. *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.") (internal citation and

quotation omitted). Plaintiff attempts at least a few sentences of argument on the subject in her *reply*, but the Sixth Circuit "has consistently held that arguments not raised in a party's opening brief . . . are waived." *See Kuhn v. Washtenaw Cnty.*, 709 F.3d 612, 624 (6th Cir. 2013).

Regardless, it ultimately matters little whether Dr. Kroll was an examining source or a treating source, as the ALJ provided "good reasons" for discounting his opinion, which Plaintiff has indicated she does not wish to challenge, (Doc. 18 at ID 694) ("This is not an issue as to the respective weighing of the various medical opinions). *See Helm v. Comm'r of Soc. Sec.*, 405 F. App'x 997, 1000 at n. 3 (6th Cir. 2011). And as for Dr. Kroll's opinion that Plaintiff was totally disabled, the ALJ does not owe even a treating source's opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1–2 (July 2, 1996).

Similarly, in her reply, Plaintiff insists she challenged "the ALJ's treatment of the findings of Dr. Kerner," pointing to the following sentence in her opening brief: "However, rather than finding Plaintiff disabled [as Dr. Kerner did], the ALJ found that she was able to perform simple employment, purportedly based primarily upon the findings of Dr. Rosenbaum and the opinions of nonexaminer Dr. Balunas." (Doc. 18 at ID 693) (quoting Doc. 15 at ID 653).Without further explanation, Plaintiff then concludes, "Quite obviously, Plaintiff *did* challenge the ALJ's finding." (Doc. 18 at ID 693) (emphasis in original).Unfortunately for Plaintiff, it is not "[q]uite obvious[]" to this reader that a single sentence summarizing the ALJ's findings amounts to a challenge to those findings. Following that single sentence, Plaintiff's brief again turns to Dr.

24

Rosenbaum and his findings, which I addressed above. Thus, I suggest that Plaintiff waived any argument on the ALJ's treatment of Dr. Kerner's findings. *See McPherson*, 125 F.3d at 995–96.

### H. Conclusion

For the above reasons, I suggest substantial evidence supports the ALJ's findings and recommend the court **DENY** Plaintiff's Motion for Summary Judgment, (Doc. 15), **GRANT** Defendant's Motion for Summary Judgment, (Doc. 16), and **AFFIRM** this case.

## III.  REVIEW

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); see also 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge. Any objections must be

25

labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  June 1, 2018                                    S/ PATRICIA T. MORRIS
                                                       Patricia T. Morris
                                                       United States Magistrate Judge


### CERTIFICATION

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: June 1, 2018                                    By s/Kristen Castaneda
                                                       Case Manager

26